Nicholson, C. J.,
delivered the opinion of the Court.
*105 Frederick Harwell died, in Fayette county, Tenn., in 1865, seized and possessed of a large real and personal estate, which he disposed of by will, appointing Win. Carraway and Wm. Trusdale his executors, the former of whom alone qualified as such. Among the assets which came to his hands were several notes, amounting in the aggregate to about $15,000, most of which were payable on their faces to Thos. J. Trowell, and the others were payable to Frederick Harwell, and by him endorsed to Thos. J. Trowell.
This bill was filed by Trowell, claiming that he was the owner of these notes, and also claiming that he was the owner of half the proceeds of twenty-nine bales of cotton, raised on the farm of Frederick Harwell in 1864, and sold by the executor. Trowell claims these notes as a gift made to him by Harwell, and he claims the proceeds of the cotton under contract for services in the year 1864.
The executor admits the possession by him of the several notes, and that they were all either payable to or endorsed to complainant, but he repels the claim set up by complainant, and insists that he found them among the assets of his testator, that they had never been delivered to complainant, that they belonged to the estate of his testator, and passed by the will to his residuary legatees. As to the claim to one-half of the twenty-nine bales of cotton, he denies that any contract was made between complainant and his testator whereby complainant was- entitled thereto.
The Chancellor sustained both of the claims of complainant, and decreed accordingly, but he decreed *106 against complainant as to an amount of gold belonging to the testator which the executor alleged had come into complainant’s hand, and had not been accounted for. Both parties appealed from the decree.
The first question in the case is, whether the gift of the notes by testator to complainant was perfected by delivery. The proof shows that Frederick Har-well, being a man of large wealth, without children, and advanced in years, about the year 1841 took into his family the complainant, who was then two or three years old, and treated and raised him as his adopted son, not, however, having actually adopted him. Testator and his wife manifested the strongest affection for him, raised him as a son, educated him, and when he grew up confided the business of the farm to him, on which he laboz’ed until he was about twenty-three years of age.
Testator manifested his attachment to complainant by frequent declai’ations of his purpose to pi’ovide liberally for him out of his estate. Testator was a man of cash capital, and was in the habit of lending his money at interest. In 1854, when complainant rvas about fifteen years of age, he commenced lending his money, and either taking the notes of borrowers payable to complainant, or taking them payable to himself and endorsing them to complainant, but still holding them in his own possession, and collecting and reinvesting the money in the same way, telling the makers of the notes that the money so loaned belonged to complainant. Testator kept up this mode of investing his money until the amount of the notes *107 so taken reached about $15,000, they being the notes now in controversy.
The proof is abundant that testator declared the money so invested and the notes so taken to be the property of complainant during a period of six or eight years, during all which time complainant lived with testator, managed much of his business, enjoyed his unbounded confidence, collected portions of the notes with the approval of testator, although testator seems to have kept the actual possession of the notes until some time during the war, probably in 1862 or 1863. About that time, testator being uneasy as to the safety of his gold and silver, as well as the notes in possession, fearing that the Federal soldiers who were in the country might make raids upon him and rob him of his money and notes, placed the same in the hands of complainant to be concealed in different places for safety.
It is in proof that the notes in controversy were placed in a wooden box and concealed under a pile of bricks. While so situated a witness proves that he was staying at testator’s house one night, sleeping in the room with complainant, when testator came to the room, roused complainant out of bed, told him he was uneasy about an apprehended raid of the soldiers, advised him to go and get his (complainant’s) notes and put them in some other place of security; that complainant accordingly went out and brought in the box of notes, placed them on the table, when testator told .him they were his notes, to take them and hide them; that testator then left, when complainant and *108 witness took the box and concealed it in a closet in the house, where it remained until after the death of testator.
It was proven by Trusdale, one of the executors, that a short time before testator’s death he told witness that he had given complainant his notes and complaint’s notes to hide to prevent the Federáis from getting them.
A nephew of testator proved that testator told him that these notes belonged to complainant, that he had given these notes to complainant, and that was all he intended to give him of his estate, and he thought if was enough. This conversation took place in March, 1865, and testator died in June afterward.
By reference to the list of notes on file it appears that nearly all of them were dated or endorsed to complainant at times antedating the period at which, according to the proof, complainant arrived at his majority.
One witness proves that in 1860 he borrowed $750 of testator and executed his notes to complainant; that in 1862 complainant, on his way to his command in the army, called on him for $230, stating he left the note with testator, as he did not want to carry it with him to -the command, but he would give him a receipt; the money was paid and the receipt given, and afterward testator entered a credit on the note for the amount.
Trusdale, one of the executors, proves that in April before testator’s death in June, testator told him he had given complainant enough to set him up in any *109 business. At the same time witness said testator told bim be had given his notes to complainant — he had given them to him to conceal them from the Feder-áis. He said one Harris owed testator a note, when he came to pay it testator told him he had to wait until complainant should come to get it — he said it was complainant’s note. In speaking of the notes testator had given complainant to conceal, witness understood him to speak of complainant’s notes and his own. On the day of testator’s burial witness heard complainant tell Carraway, the executor, that he had some notes there that testator had signed over to him, that they were in the bottom of the stair steps in the house. The executor afterward got the notes in controversy from that place. Complainant told the executor he put them there.
For the purpose of rebutting and overturning this evidence, defendant proves that about eight months before testator died he lost his wife, and that immediately after her death complainant was married; that testator was much offended and incensed at him for getting married — expressed his determination to give Mm none of his estate. He seems to have had a peculiar aversion to the marriage of his family, as he had already erased the names of two his relations from his family record because of their marriages, and now he did the same thing on account of complainant’s marriage. No other reason was given for his estrangement from complainant, but he commenced after that time to insinuate that complainant had not been faithful in regard to the gold and silver which had been *110 entrusted to him to be concealed. His account of the amount of his treasure concealed and lost was not uniform. To some he spoke of having $35,000 in gold and silver concealed or buried; to some he represented his loss at $25,000, to others he said most of it was found, except $5,000 which was said to have been buried by complainant. His various declarations leave it entirely uncertain what amount was concealed and what amount was lost, and there is evidence tending to show that what was lost may have been taken by his own negroes, of whom he had about one hundred. The most probable explanation of his insinuations is, that he never thought of implicating complainant in the loss of his money until he fell out with him for getting married; and but for this estrangement he never would have suspected complainant of having been unfaithful. It is in proof that complainant has ever since lived in the immediate nighborhood, working daily on a farm for a subsistence, and being regarded by all as an industrious, economical and honest citizen.
It is proven by a nephew of testator that some short time before his death testator was somewhat reconciled to complainant’s marriage, and he appeared to be a great deal better satisfied about it, and he so-expressed himself, and said he wished complainant well, and wished he might do well. In the same conversation he said that he had given complainant the notes. He said also that the reports about complainant taking his money were wrong, that he put out the reports for fear his negroes might rob him. He entirely ac *111 quitted complainant of the charge of having taken his money.
The most important testimony for defendant is given by Mrs. McMurry, who lived in the house with testator .for four years before his death, and who is a legatee, but was made competent as a witness by having received her legacy from the executor. She says she never heard complainant claim any notes in presence of testator, nor did she ever hear testator refer to the notes as complainant’s. She says testator kept his notes hid for awhile in a brick pile, and afterward moved them and hid them in the closet, and told her to keep the door locked, as his notes were in there,, and he did not want any person to get them. She never knew of complainant hiding them; she knew of testator taking them out twice. She says she always carried testator’s keys after his wife’s death. In this last statement she is not corroborated, as another • witness of defendant, who lived in the house, says she only carried the smoke house keys, but that testator carried the keys of his closet. And Mrs. Tucker, another witness of defendant, says she heard testator say he would rather Mrs. McMurry would have nothing to do with his keys. This witness also proves that Mrs. McMurry told her that complainant had possession of the money and papers of every kind belonging to testator.
Mrs. McMurry further testified that a few days after complainant’s marriage he came to testator’s house and told him he was willing to live with him if he would take him, but testator told him no, he should *112 not live under a roof with him, to get what belonged to him and leave, never to put his foot there again. Complainant claimed a young colt and a pair of gloves, which testator told him to take, but complainant said nothing about taking the notes. As to the gloves, another witness of defendant, who was present, says that when complainant claimed them testator said they were not his, and that complainant laid them down. Complainant never visited testators house after this until the day he died.
Testator made his will in June, 1865, a short time before his death. After making specific devises of his lands, and a number of money legacies, among his relations, he closes it with a residuary clause, in which he says “the residue of my estate, whatever it may be found to be worth, after paying my executors, to be equally divided between the heirs of Thomas Crittenden, deceased,” etc, No allusion is made to the large amount of notes now in controversy, unless he intended them to be embraced by the words “the residue of my estate.” As these notes amounted to about twelve or fifteen thousand dollars, and as he knew the legal title to them was all vested in complainant, it is hardly probable that he would pass them over without special notice, if he intended them to pass by his will.
From this evidence we cannot resist the conclusion that the testator took the several notes in controversy in the name of complainant with the view of holding, collecting, and reinvesting their proceeds for the benefit of complainant, and that he kept possession of them *113 during the minority of complainant as his property. When complainant became 'of age we are of opinion that testator continued to retain possession because the occurrence of the war about that time, and the fact that complainant went into the army, made it proper that they should be kept at home in safety. It appears satisfactorily that although testator retained the possession of the notes, he distinctly recognized complainant’s right to collect them and use the proceeds at his pleasure. It further appears that complainant had the actual possession of them as early as 1862 or 1863, and that under the advice of testator he concealed them as his own property.
The only evidence which militates materially aginst these conclusions is that which represents testator as ordering complainant to leave his house, and to take with him every thing which he claimed, and that complainant at that time made known no claim to the notes, but submitted’ to obey the order without setting up his right to take the notes. Whether complainant was induced to withhold his claim to the notes at that time because of his unwillingness to provoke testator to further violence, under the hope of an early reconciliation, and in view of the fact that testator had acted toward him as a father, and had induced him to look for much larger benefits in the disposition of his large estate, or rvhetlier he was in fact ignorant that his right to the notes had been perfected, and on that account that he made no claim to them, we deem it unnecessary to inquire. It is sufficient -for us to say that in the view we take of the facts com *114 plainant's title to the notes had been already perfected by gift, accompanied first with constructive and afterward with actual possession, and that his silence as to his rights under the circumstances could not divest him of his title.
It is well settled that delivery is essential to the validity of a parol gift of a chattel or ehose in action; and without delivery and a transfer of the possession, the title does not pass to the donee; but the delivery must be according to the nature of the thing. The effect of a valid delivery is to place the subject of the gift under the control and dominion of the donee, and his title and right to possession become absolute and irrevocable. McEwen v. Troost, 1 Sneed, 190. If the thing given be a chose in action, the law requires an assignment, or some equivalent instrument, and the transfer must be actually executed. 2 Kent, 439.
In the present case the proof makes out every requisite of a valid gift. From 1854 to 1861, while complainant was a minor, the testator openly and repeatedly declared that the money which, he was vesting in the notes was the money of complainant, and as conclusive evidence of the gifts of the notes he either took them payable to complainant, or he endorsed them to him. The legal title thus passed to complainant, and the testator held the notes as trustee for complainant until they were finally actually delivered over to him to be by him preserved from the apprehended danger of robbery.
The next question is as to the claim of complain *115 ant to one-half the proceeds of twenty-nine bales of cotton raised on the plantation of testator in 1864. The proof fully sustains the allegation of the bill that there was a contract between complainant and testator by which complainant was to be entitled to one-half of the crop óf 1864 raised on the place.
The Chancellor sustained the bill on both claims, and decreed accordingly. We agree with him in his conclusions as to these claims, and affirm his decree; but we cannot agree with him in ordering an account as to the gold of testator not accounted for by complainant. We think the proof fails to show any real ground for holding complainant liable for any lost gold or silver, and so much of the decree as orders an account as to the gold or silver is reversed. The costs will be paid by the executor out of the assets in his hands.